# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**WILLIAM A. METZGAR,**

    **Plaintiff,**

**vs.**                                                                                        Civ. No. 01-0011 JP/RLP

**LARRY G. MASSANARI,**
**Acting Commissioner of the**
**Social Security Administration,**

    **Defendant.**

## UNITED STATES MAGISTRATE JUDGE'S
## ANALYSIS AND RECOMMENDED DISPOSITION[1]

### I. Procedural Background

1.     Plaintiff, William A. Metzgar, filed applications for Disability Insurance Benefits under Title II of the Social Security Act and for Supplemental Security Income under Title XVI of the Social Security Act, on September 12, 1995. (Tr. 97-100, 515). His alleged date of onset of disability is August 1, 1991. (Tr. 165). His applications were denied by an Administrative Law Judge (ALJ herein) on April 22, 1997. (Tr.30-41, 50-61). The Appeals Council remanded to the ALJ on September 14, 1998. (Tr. 88-89). The ALJ conducted a new hearing on May 18, 1999 (Tr. 528-563), and again denied Plaintiff's claim in a decision dated July 29, 1999. (Tr. 10-23). The Appeals Council declined to review the ALJ's second decision on November 11, 2000. (Tr.6-7).

---

[1]Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. §636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

## II. The Adjudicated Periods

2.  Plaintiff was last insured for Disability Insurance Benefits as of December 31, 1993. (Tr. 101). Therefore, he must establish his disability prior to that date to qualify for Title II benefits. § 20 C.F.R. 404.101(a). Plaintiff filed his application for Title XVI benefits on September 12, 1995. Therefore the period of time relevant to his claim for SSI benefits is September 12, 1995, to the date of the ALJ's decision, July 29, 1999. §§ 20 C.F.R.416.202(g), 416.305, 416.501.

## III. The ALJ's Decision.

3.  The ALJ originally denied Plaintiff's claims in a decision dated April 22, 1997. (Tr. 30-41). The Appeals Council vacated the decision and remanded to the ALJ on September 14, 1998, with instructions to (1) give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations, and (2) make a materiality determination[2] in relation to substance abuse, if Plaintiff were found disabled. (Tr. 88-89).

4.  A second hearing before the ALJ was held on May 18, 1999. In a decision dated July 29,

---

[2] On March 29, 1996, Congress amended provisions of both Title II and Title XVI to provide that "[a]n individual shall not be considered to be disabled for purposes of this title if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." Contract With America Advancement Act of §1996, Pub.L. 104-121, 105(a)(1), (b)(1), 110 Stat. 847, 852, 853 (codified as amended at §§42 U.S.C. 423(d)(2)(C), 1382c(a)(3)(J) (1997)). The implementing regulations make clear that a finding of disability by the Commissioner is a condition precedent to an application of the amendatory language: "If [the Commissioner] find[s] you are disabled and ha[s] medical evidence of your drug addiction or alcoholism, [the Commissioner] must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." §§20 C.F.R. 404.1535(a), 416.935(a). To make this determination, the Commissioner must decide whether the claimant would still be found disabled if the claimant stopped using drugs. See id. §§ 404.1535(b)(1), 416.935(b)(1). If so, then the drug addiction is not a contributing factor material to the finding of disability. See id. §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii). If, however, the claimant's remaining impairments would not be disabling without the drug addiction, then the drug addiction is a contributing factor material to the finding of disability. See id. §§ 404.1535(b)(2)(I), 416.935(b)(2)(I).

2

1999, the ALJ found Plaintiff that was not disabled, in that he retained the mental and physical residual functional capacity for simple, unskilled work at the light exertional level. (Tr. 12-22). The Appeals Council declined to review Plaintiff's claim on November 1, 2000. (Tr. 6-7).

### IV. Standard of Review.

5.     This Court reviews the Commissioner's decision to determine whether the record contains substantial evidence to support the findings made by the ALJ, and to determine whether the correct legal standards were applied. Castellano v. Secretary of Health & Human Services, 26 F.3d 1027, 1028 (10th Cir.1994). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Soliz v. Chater, 82 F.3d 373, 375 (10th Cir.1996) (quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). In reviewing the Commissioner's decision, I cannot weigh the evidence or substitute my discretion for that of the Commissioner, but I have the duty to carefully consider the entire record and make my determination on the record as a whole. Dollar v. Bowen, 821 F.2d 530, 532 (10th Cir.1987).

6.     The Commissioner has established a five-step sequential evaluation process to determine if a claimant is disabled. Reyes v. Bowen, 845 F.2d 242, 243 (10th Cir.1988). If a claimant is determined to be disabled or not disabled at any step, the evaluation process ends there. Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir.1989). The burden of proof is on the claimant at steps one through four; the Commissioner bears the burden of proof at step five. Id.

### V. Vocational and Educational Facts

7.     Plaintiff was born on October 23, 1952. (Tr. 97). He was 46 years at the time of the ALJ's 1999 decision denying benefits. He is a high school graduate, but is functionally illiterate. (Tr. 115, 153, 468). He has no past relevant work history.

## IV. Plaintiff's Alleged Disability

8.      In written records filed with his applications for benefits on September 12, 1995, Plaintiff stated that he was disabled by chronic low back pain, the inability to bend, tingling and numbness of his legs, an inability to lift ten pounds or more, limited ability to stand and sit, migraine headaches, loss of memory and a recovering heroin addiction. (Tr. 111). In written materials submitted on October 3, 1995, he complained of back pain, fatigue, problems with memory and concentration, depression, social isolation and difficulty getting along with people in authority. (Tr. 127-137). At his administrative hearing, Plaintiff testified that the had been drug free for "a couple of years," and had no legal problems for the past five years. (Tr. 532-533). He stated that he could not work as a pet groomer, one of his prior jobs, because of the lifting required, couldn't be around people, had problems with people in authority, memory problems, nervousness and anxiety, sleep difficulties because of back problems, tossing and turning, mental problems and lack of motivation. (Tr. 535-537, 542-544).

## V. Evidence Relevant to Plaintiff's Claim for Disability Insurance Benefits
## August 1, 1991-December 31, 1993

9.      Plaintiff was seen at the University of New Mexico Mental Health Center ("UNM-MHC" herein) on August 2, 1991, requesting heroin detoxification. At that time he stated he had no medical conditions, but was "depressed" because he had done nothing with his life. (Tr. 277). He was admitted to a detoxification program on August 5, 1991. Mental status[3] and physical examinations (Tr. 273-274) conducted at that time were normal.

---

[3] "Appropriate dress, hygiene & grooming. Posture and gait wnl. Speech rate and rhythm normal. A & O x 4. Cooperative attitude. Mood quiet & affect appropriate. Denies delusions & hallucinations. Thought processes goal-directed. Intelligence wnl. Verbalizes good insight & judgment." (Tr. 273).

10.     Plaintiff began drug counseling and Methadone treatment in December 1991, as a condition of probation following a conviction for shoplifting. (Tr.262, 264-265, 257). When interviewed by his drug counselor at UNM-MHC on November 12, 1992, he denied any medical problems. (Tr. 254). Mental status examination was again normal. (Tr. 255).

11.     Plaintiff continued receiving counseling and Methadone through UNM-MHC through the date he was last insured for DIB, December 31, 1993. During that time he was jailed for several months on shoplifting charges, and forcibly detoxed from heroin. (Tr. 214, 236- 247, 403). On January 11, 1993, he complained of depression, but was assessed as "more apathetic than depressed." (Tr. 247). On June 25, 1993, he was evaluated at the emergency room of the University of New Mexico Hospital ("UNMH" herein) for complaints of neck, back and groin pain, following a beating. On physical examination he had a reducible inguinal hernia, but his neck was non-tender and he had no obvious trauma other than some superficial lacerations. He was assessed has having "no significant medical problems." (Tr. 330).

12.     Plaintiff started an ambulatory heroin detoxification program at UNM-MHC on June 28, 1993, but continued to use heroin. (Tr. 220, 223,225, 232, 227, 228, 230 ). He was evaluated at the UNMH emergency room on July 5, 1993, claiming that he had been assaulted the prior week. The triage note states: "Migraines & low back pain. Vague (complaints). Adds a multiple of (complaints) nose, back, migraines, head, etc. Nonspecific. (No acute distress). No noted problem. (-) N,V, photo phobia . . ." (Tr. 327). The only abnormality noted on physical examination was moderate bilateral para-lumbar tenderness. He was diagnosed with mild concussive syndrome, advised to take Tylenol and scheduled for a neurological follow-up. (Tr. 327-328). A CT scan was performed the following day, and was normal. (Tr. 329).

13.     Plaintiff was placed in an inpatient drug treatment program at UNMH from July 7 through 15, 1993. (Tr. 213). Physical examination on admission, including examination of his back and neurological functioning, was entirely normal except for the previously noted inguinal hernia.[4] (Tr. 216). His mental status exam on admission stated:

> Patient is a well-groomed, thin, Hispanic appearing male, appearing younger than stated age. He is completely cooperative with the examination. His speech, posture and general behavior are unremarkable. Mood he states to be positive. Thought processes are linear and logical and thought content is appropriate to the discussion. He denies any auditory/visual hallucinations. He is alert and oriented in all spheres. His attention is unimpaired. Concentration is normal. Insight is fair, judgment is clearly compromised by his repeated use of opiates while in treatment with the threat of reincarceration.

(Tr. 214). On discharge, he was in "excellent physical health and felt to be psychiatrically stable." (Tr. 213).

14.     Plaintiff was seen at the UNMH emergency room on September 23, 1993, complaining of occipital headache, neck and back pain. On examination, his back and neck muscles were tender, but he retained full range of motion. He was diagnosed with muscles spasm and referred for physical therapy. (Tr. 318).

15.     On October 1, 1993, Plaintiff was an inpatient at an alcohol detoxification program, and admitted to the Espanola Hospital for a duodenal ulcer and pancreatitis, which resolved with medication. (Tr. 292-293.)

16.     Plaintiff began physical therapy at UNMH on December 1, 1993, for neck and upper back pain and muscle spasm. He demonstrated no other musculo-skeletal deficiencies at that time. (Tr. 316). He returned for one treatment, and was subsequently discharged for failing to show for his

---

[4]Plaintiff's hernia was repaired surgically at UNMH on July 18, 1993. (Tr. 325).

6

regularly scheduled visits. (Tr. 315).

17. As of December 18, 1993, Plaintiff was enrolled in another Methadone treatment program (Tr. 363, 259), and "appear(ed) to be in good health." (Tr. 359).

### VI. Evidence Relevant to Plaintiff's Claim for Supplemental Security Income September 12, 1995 - July 19, 1999

18. G.T. Davis, M.D., evaluated Plaintiff on November 13, 1995, on behalf of the disability determination unit. (Tr. 337-344). Dr. Davis found no physical abnormalities which would impact on his ability to work.[5]

19. Carlos Balcazar, M.D., conducted a psychiatric evaluation on November 13, 1995. (Tr. 345-347). Plaintiff complained of neck and back pain, headaches and memory loss, and reported his history of legal problems, homelessness, alcohol and drug abuse, and current use of Methadone. Based on history and mental status examination[6], Dr. Balcazar made the following diagnosis: §§

---

[5] "(He) seems alert and oriented. . . Hearing and speech were intact. Gait was normal and balance was good. He demonstrated normal ability to talk on his toes, heels and squat down. Limb measurements in the upper and lower extremities were symmetrical without atrophy. Cervical, thoracic and lumbar motions were good. There was no spasm palpable in the spinal regions, but he reported some tenderness with palpation of the lower back and with forward bending. Straight leg raising was negative seated bilaterally.
"Examination of the upper extremities showed full motion of the shoulders, elbows, wrists and fingers, with the exception that the left shoulder abduction was limited to 130 degrees. There was slight crepitation with circumduction of the shoulder but there was no muscular weakness. The deep tendon reflexes were 1+. Motor and sensory functions were intact. Hand functions were good.
"Examination of the lower extremities showed good motion of the hips, knees and ankles. The deep tendon reflexes were 2+. The motor and sensory functions were intact."

[6] ". . . He was appropriately dressed and his general appearance was clean. He was able to provide pertinent information. his attention span was good as well as his capacity to cooperate. He communicated affect and his mood did not show any particular quality. His emotional reaction was appropriate to the circumstances and content of thought. Remote memory was preserved. He named Clinton, Reagan, Nixon, Johnson, Kennedy and Carter as presidents of the United States. He remembered two words out of three I asked him to memorize ten minute before. What he considers loss of memory refers to episodes in the past when he was under the influence of alcohol or drugs. He was able to repeat six digits forward and four digits backwards. He could perform simple mental arithmetical calculations of addition and subtraction with some difficulty but he could not multiple (sic)nor could he divide. His answers to similarities and proverbs were

7

| | |
|---|---|
| Axis I: | Alcohol abuse. Drug abuse (heroin) presently in remission. Methadone dependence. |
| Axis II: | Atypical personality disorder with some antisocial features. |
| Axis III: | Complaints of lower and upper back pain as well as headaches. |
| Axis IV: | Psycho social stressors during the court of the last year have been moderate. |
| Axis V: | The optimal functioning during the course of the last year has been poor. |

> I think this man could have adequate judgement to plan a work sequence. From a psychiatric standpoint he could use tools and material for simple jobs as well as he could perform one or two step repetitive tasks at a competitive rate. Based on my contact with him I would not foresee difficulty in his interaction with coworkers and supervisory personnel.

(Tr. 347).

20. Plaintiff was evaluated by Emmett Altman, M.D., an orthopedic surgeon, on February 5, 1996. At that time, Plaintiff complained of low back pain, limited ability to walk and stand and the need to change positions frequently. Physical examination and x-rays revealed no orthopedic findings that would justify his complaints.[7] (Tr. 455).

21. On October 23, 1996, Carmen Martin Lara, Ph.D., conducted a psychological examination. (Tr. 466-473). Dr. Lara described Plaintiff as appearing "very healthy and well taken care for," "clean," "well groomed," "relaxed and comfortable," "cooperative," "pleasant," and non-

---

concrete. In my opinion his intelligence is in the low average. His line of thought was goal oriented. I could not detect any loose associations nor delusional thinking present. His sensorium was clear during the examination and he denied either past or present hallucinatory experiences." (Tr. 346).

[7]"This is a well nourished, well developed individual who stands with the pelvis and shoulders level. The spine in straight. He walks without a limp. He has no difficulty getting around in the office, getting dressed, undressed or up on the exam table. There is a full range of lumbar, cervical motion, upper and lower extremity motion. Though he does complain of some discomfort on full elevation of the left shoulder. He has straight leg raising bilaterally to 90 degrees. Single and double thigh flexion are well performed. He has negative sciatic stretch test, Lasegue and Bragard. Deep tendon reflexes are symmetrical in the upper and lower extremities +3. Sensation is intact. There is no weakness or atrophy. Leg lengths are equal. Lumbosacral x-rays show no osseous pathology whatsoever."

8

manipulative. (Tr. 467). He understood the purpose of the evaluation and demonstrated a normal attention span, had no pressure of speech or difficulty with pronunciation, had normal problem solving ability and normal adult interests. Dr. Lara administered the WAIS-R, which indicated that Plaintiff's intelligence was in the normal range. In assessing his mental status, Dr. Lara noted the following:

> His mood was flat. He disclosed no symptoms of anxiety. He was in contact with reality. He was oriented to time, place, situation. His speech was clear, logical and relevant. His thought processes appear to be normal. He had no problems retaining thoughts. He did not deviate from the context of the interview. (He) reported no history of alcohol or drug abuse, except heroin. His adaptation to reality is poor. His judgement is poor. His ability to relate to others is normal. He had no signs or symptoms of perceptual disorder. His memory short and long term is intact. His reality test is poor. He reported having no delusions or perceptual ideation. He reported no visual or auditory hallucinations. (He) reported no suicidal thoughts or ideation. He was not dangerous to himself or others at the time of the interview. Intellectually he appeared to be of normal intelligence, with no possibility of brain damage or organic defections.

(Tr. 469-470).

22. Plaintiff returned to UNMH for a six month course of physical therapy for his back in the Spring of 1997. (Tr. 493). The records of those treatments are not contained in the administrative record. In April 1997, Plaintiff was receiving health care from Sue Brown, M.D., at Health Care for the Homeless. Dr. Brown's office records are not contained in the administrative record. She did, however, prepare letters for him, stating that he had scoliosis and muscle spasm. (Tr. 490, 492). Her records do not describe any functional impairment resulting from this condition.

23. Plaintiff began receiving psychiatric care at UNM-MHC in March 1999. As of April 1, 1999, Plaintiff was prescribed *Imipramine* for depression, and received counseling for dealing with "avoidance traits." (Tr. 509). On April 22, 1999, Plaintiff was still assessed as depressed, but was able to identify and chart his symptoms of depression. His prescription for *Imipramine* was

9

continued. (Tr. 508). On May 6, 1999, Plaintiff stated his depression was "the same," and described frightening dreams and hearing voices which told him he was "worthless." Assessments prepared by two care providers on that day state:

> A: Opioid dependent or Agonist therapy. Major Depression. R/O (rule out) avoidance personality disorder. R/O dissociative disorder per description of "talking to someone who's not there who always puts me down and tells me I'm useless . . . I argue with it." Pt. lists this as current reason for depression.
>
> A: Depression, voices related to depression. "I am worthless." No suicidal plans.

(Tr. 510).

Plaintiff was prescribed an additional medication on May 6, 1999, *Mellaril*, also known as *Thioridazine Hydrochloride*.[8] (Tr. 201, 510).

24. In March 1999, while Plaintiff was receiving Psychiatric care at UNM-MHC, Plaintiff's counselor at his Methadone treatment program referred him to the Department of Vocational Rehabilitation, which in turn referred Plaintiff to Edward Naimark, PhD., for evaluation. (Tr. 500-507). Dr. Naimark conducted a clinical interview and evaluation on March 16, 1999. Plaintiff complained of a lack of motivation, auditory hallucinations, a sleep disorder, social phobia and depression which had been present for the past eighteen months. Plaintiff also stated that he had been seen on one occasion by a psychiatrist who had diagnosed depression with psychotic features, and had placed him on medication. In his mental status exam, Dr. Naimark noted that Plaintiff had significant pain behaviors, and complained of auditory hallucinations and suicidal ideation. Dr. Naimark described Plaintiff as able to maintain good eye contact, oriented to time, place and person, and cooperative, but that he appeared to have severely impaired memory and concentration. Based

---

[8]*Mellaril* is used to treat both psychotic disorders and moderate to marked depression with variable degrees of anxiety. 1995 Physicians' Desk Reference, p. 2168.

on history and mental status examination, Dr. Naimark diagnosed Major Depressive Disorder, severe, with psychotic features and Opioid Abuse, in partial remission, on methadone maintenance (Axis I). He gave Plaintiff a current global assessment of functioning ("GAF" herein) of 40 with some impairment in reality testing, and prior year GAF of 45 with serious symptoms with some impairment in reality testing. (Tr. 507).

25.  Dr. Naimark administered the MMPI to Plaintiff on April 1999. (Tr. 499). The MMPI results were invalid. However, because he had identified psychotic features at the prior clinical interview, Dr. Naimark interpreted the MMPI results as indicative of poor judgment, short attention span and visual or auditory hallucinations. He concluded that Plaintiff would not benefit from rehabilitation services. (Tr. 498-499). Dr. Naimark prepared a Psychiatric Review Technique Form (PTRF) on May 17, 1999, indicating his opinion that Plaintiff suffered from severe, permanent impairment, due to significant depressive ideation, auditory hallucinations, sleep disorder and social phobia. (Tr. 190-197).

### VII.  Issues on Appeal.

26.  Plaintiff contends that the ALJ erred by:

   1.  Failing to develop the record.

   2.  Failing to properly assess the severity of his mental and physical limitations pursuant to Social Security Ruling 96-3p.

   3.  Failing to properly evaluate his maximum residual functional capacity pursuant to Social Security Ruling 96-8p

   4.  Applying the Medical-Vocational Guidelines (grids) despite Plaintiff's non-exertional impairments of pain and depression.

## VIII. Analysis
### A. Plaintiff's Claim for Disability Insurance Benefits

27. Plaintiff contends that the ALJ failed to develop the record because she did not supplement the record with regard to Plaintiff's physical and mental condition, despite having before her Dr. Brown's assessment that Plaintiff had scoliosis, and Dr. Naimark's assessment of Plaintiff's severe mental impairments. The ALJ's duty to develop the record exists in every case, whether or not the claimant is represented. Carter v. Chater, 73 F.3d 1019, 1021 (10th Cir. 1996). However, it is not the ALJ's duty to be the claimant's advocate. Henrie v. United States Dept. of Health & Hum. Serv., 13 F.3d 359, 361 (10th Cir. 1992). "The ALJ has a basic duty of inquiry, 'to inform himself about facts relevant to his decision and to learn the claimant's own version of those facts.'" Casias v. Secretary of Health & Hum. Servs., 933 F.2d 799, 801 (10th Cir. 1991) citing Dixon v. Heckler, 811 F.2d 506, 510 (10th Cir. 1987), citing Heckler v. Campbell, 461 U.S. 458, 471 n. 1 (1983) (Brennan, J., concurring).

28. There is no question that the record was complete as it relates to Plaintiff's claim for DIB. There is substantial, even overwhelming evidence, to support the ALJ's determination that there was had no evidence of a serious physical or mental impairment existing as the date Plaintiff was last insured.

29. As regards Plaintiff's physical condition, the ALJ found that there was no evidence of a pain-producing impairment until November 1995. (Tr. 17.) The record fully supports this finding. Physical examinations by treating physicians from August 1991 to December 1993 were normal. (Tr. 273-274, 330, 363). Plaintiff did complain of migraine headache and low back pain in July 1993. (Tr. 327). By mid July, however, he was in "excellent" physical health (Tr. 213) with no spinal or CVA tenderness. (Tr. 216). Plaintiff had recurrence of headache, neck and back pain with muscle spasm

in September 1993, for which he was referred to physical therapy. (Tr. 317-318). He failed to appear for his scheduled therapy sessions (Tr. 315), and in February and in April 1994, stated he had no health problems other than heroin addiction. (Tr. 362, 361).

30.     As regards Plaintiff's mental condition prior December 31, 1993, the date he was last insured, all evaluations of his mental condition were normal except for his drug addiction. (Tr. 273-274, 263, 255, 247, 213-214, 436-437). In support of her finding that Plaintiff had not established a severe mental impairment, the ALJ referred to Plaintiff's normal psychological examination as of June 1993, Dr. Balcazar's November 1995 psychiatric evaluation and Dr. Lara's 1996 psychological evaluation (Tr. 14-15). All of these evaluations are consistent with the finding that Plaintiff's mental condition did not preclude him from performing simple, unskilled work.

31.     The record contains substantial evidence to support the ALJ's denial of Plaintiff's claim for disability insurance benefits, and the ALJ applied correct legal standards in evaluating that claim.

### B. Plaintiff's Claim for Supplemental Security Income
### 1. Duty to Develop the Record

32.     Plaintiff does not identify any existing medical records that the ALJ failed to obtain. His claim that the ALJ failed to develop the record is in fact a claim that she failed to obtain additional consultative evaluations. The Commissioner is granted broad latitude in determining whether or not to order consultative examinations. Diaz v. Secretary of Health & Hum. Serv's., 898 F.2d 774, 778 (10th Cir. 1990). The ALJ had before her physical condition (Drs. Davis and Altman), two consultative examinations addressing Plaintiff's mental condition (Drs. Balcazar and Lara), a psychological evaluation done at the request of the Department of Vocational Rehabilitation (Dr. Naimark), and numerous evaluations, physical and mental, by treating care providers (UNMH-emergency room, UNM-MHC). Further consultative evaluation was not required.

13

## 2. Evaluation of the "Severity" of Plaintiff's
## Mental Impairment Pursuant to Social Security Ruling 96-3p.

33.     Social Security Ruling 96-3p addresses the ALJ's duty at step two of the sequential evaluation process to consider "allegations of pain and other symptoms in determining whether a medically determinable impairment is severe." An impairment or combination of impairments is "non-severe" if it does not significantly limit the individual's physical or mental ability to do "basic work activities."§20 C.F.R. 416.921(a); Social Security Ruling 96-3p.[9] The ALJ concluded that Plaintiff had failed to demonstrate "that he has experienced more than a minimal impact on his work related functional capacities due to any severe underlying psychological disorder, including the effects of his poly-substance abuse." (Tr. 13-14). In reaching this conclusion, the ALJ cited to the psychiatric review technique forms prepared by two non-examining psychiatric consultants (Tr. 139- 147, 154-162) which were "not inconsistent with the evidence or opinion of any treating physician." (Tr. 14). The ALJ then reviewed in detail the medical evidence related to Plaintiff's psychiatric condition from treating sources as well as consulting physicians who examined Plaintiff at the request of the Disability Determination Unit. (Tr. 14-15).

34.     Plaintiff contends that the ALJ violated S.S.R. 96-3p by failing to properly assess the severity of his mental limitations because she "failed to credit" Dr. Naimark's evaluation of his mental condition, did not consider Plaintiff's testimony regarding his mental condition, and because the ALJ focused on Plaintiff's past addiction rather than mental limitations for the relevant time period.

---

[9] "Basic work activities" include mental capacities for understanding, carrying out, and remembering simple instructions, using judgment, responding appropriately to supervision, co-workers, and usual work situations, § 20 C.F.R.416.921(b)(1)-(6). An impairment can be considered "non-severe" only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience. See Brown v. Bowen, 827 F.2d 311, 312 (8th Cir.1987); Akbar-Afzali v. Callahan, 968 F.Supp. 578, 583-85 (D.Kan.1997).

35. It is manifestly clear that Plaintiff presented no evidence of a mental impairment impacting the ability to perform basic work related activities, apart of drug dependancy, through October 23, 1996. It is also clear that the ALJ considered Plaintiff's testimony related to his mental impairment, and found that testimony to be less than credible. (Tr. 13-17). The ALJ discussed Plaintiff's prior addiction because all of the psychiatric and psychological evaluations he has had have been in connection with addiction treatment.

36. The ALJ discussed and discounted Dr. Naimark's evaluation for the following reasons: (1) Dr. Naimark did not have a treatment relationship with Plaintiff. (2) Dr. Naimark described Plaintiff as well oriented, and able to express himself effectively, findings the ALJ found questionable were psychosis present. (3) Plaintiff's treating mental health care providers at the time of Dr. Naimark's evaluation did not diagnose psychosis. They diagnosed Major Depression, rule out dissociative disorder. (4) Plaintiff's treating mental health care providers still did not mention psychosis or psychotic symptoms three months after he began psychotropic medications. (5) Dr. Naimark's opinion that Plaintiff would not benefit from vocational rehabilitation services was inconsistent with the actions of his treating psychiatrist and counselor, who referred him to the DVR. (6) There was no evidence that the specialists at DVR considered Plaintiff unable to benefit from vocational services. (7) There was no evidence that Plaintiff's treating physicians had recommended any particular work restrictions. (Tr. 9-10).

37. I have disregarded factor two as it is a medical judgment the ALJ is not competent reach. See Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996). The remaining factors listed by the ALJ are

appropriate standards by which to evaluate the opinion of Dr. Naimark.[10] The ALJ has the ability to resolve conflicts in the medical evidence. Richardson v. Perales, 402 U.S. 389, 399 (1971); Casias v. Sec'y of Health & Hum. Serv., 933 F.2d 799, 801 (10th Cir. 1991). The Court may not reweigh the evidence or substitute its judgment for that of the Commissioner. Casias v. Sec. of Health & Hum. Serv., 933 F.2d 799, 800 (10th Cir. 1991); Sisco v. U.S. Dept. of Health & Hum. Serv., 10 F.3d 739, 741 (10th Cir. 1993); Hamilton v. Sec'y of Health & Hum. Servs. 961 F.2d 1495, 1498 (10th Cir. 1992).

38.     I find that the ALJ applied correct legal principles in evaluating Plaintiff's mental impairment, and that substantial evidence supports her findings.

### 3. Evaluation of Plaintiff's Maximum Residual Functional Capacity Pursuant to Social Security Ruling 96-8p

39.     The claimant bears the burden of proof at steps one through four of the sequential evaluation process. See Nielson v. Sullivan, 992 F.2d 1118, 1120 (10th Cir.1993). The claimant's residual functional capacity ("RFC" herein) is determined once, in detail, at step four of the sequential evaluation process. See §§20 C.F.R. 404.1520(e) 416.920(e), Social Security Ruling 96-9p, 1996 WL 374185, at *2, *5-*9; Social Security Ruling 96-8p, 1996 WL 374184, at *5-*7; Social Security Ruling 86-8, 1986 WL 68636, at *4; see also Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir.1996). The determination of RFC is an administrative assessment, based on all the evidence of how plaintiff's

---

[10]An ALJ must consider the following specific factors to determine what weight to give any medical opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. §20 C.F.R. 416.927(d)(2)-(6).

impairments and related symptoms affect his ability to perform work related activities. See S.S.R. 96-5p, 1996 WL 374183 at * 5; 96-8p, 1996 WL 37184 at *2. The final responsibility for determining RFC rests with the Commissioner. See §§20 C.F.R. 416.927(e)(2); 416.946.

### **Physical RFC**

40. The ALJ determined that as of November 1995, Plaintiff had a pain producing impairment which limited him to light work.

> The claimant's testimony of subjective complaints and functional limitations, including pain, was not supported by the evidence as a whole in the disabling degree alleged and therefore lacked credibility. While he alleges chronic back and shoulder pain since his alleged onset date, his records from the mental health center in July 1991 reveal that his physical examination was normal, and his next physical examination performed in June 1993 at the time he entered into his detoxification program also indicated that his physical condition was normal. (Citation omitted). In May 1993 he was released to return to work without any restrictions, after having been treated for a dog bite. (Citation omitted).
>
> The first indication that the claimant might have a pain producing impairment was from the results of his consultative clinical evaluation performed in November 1995 (Citation omitted). However, although the doctor found limitations of shoulder movements and noted that claimant's reports of back pain, he stated that the examination made only minimal findings except for limited shoulder movements, and there was no reason the claimant could not work. The claimant has sought little treatment for physical symptoms, nor has he required any medications for any physical condition.
>
> The claimant has retained a residual functional capacity which supports ... light work activities. Nonexertional factors have not significantly altered this work capacity. . . . His medical records indicate that more recently, 1997, he was referred for physical therapy for back spasms and mild scoliosis. (Citation omitted). However, there is no evidence that he has any degenerative back condition. My finding limiting him to exertionally light work accords him the benefit of a doubt, since he has not required any ongoing treatment for his back or shoulder, he has not required any prescribed pain medications, and no treating doctor has recommended any particular restriction on his activities.

(Tr. 17-18).

41. At no point did the ALJ express Plaintiff's exertional capabilities on a function by function

17

basis. This was error. SSR 96-8p, 1997 WL 374184, at *3, requires that a function by function assessment be performed in order to correctly analyze claims at both step four and step five of the sequential evaluation process. By failing to do so, the ALJ failed to apply correct legal principles in evaluation of Plaintiff's claim. §20 C.F.R. 402.35(b)(1) (The ALJ is bound by the agency's rulings).

### Mental RFC

42. Consistent with SSR 96-8p, the ALJ considered Plaintiff's mental RFC, even though she had found that he had no "severe" mental impairment. SSR 96-8p, 1996 WL 374184, at *5 ("The adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe."). In terms of Plaintiff's mental RFC, the ALJ did conduct a function by function analysis, and found that Plaintiff had the mental RFC for simple, unskilled work. (Tr.23,18). This finding is fully supported by the evaluations of Drs. Balcazar and Lara.

### 4. Applying the Medical-Vocational Guidelines (Grids)

43. Plaintiff argues that the record supports the existence of various significant nonexertional impairments and therefore, the ALJ erred in relying on grids to reach his disability determination. I do not find it necessary to address this issue in light of the ALJ's error at step four.

### IX Recommended Disposition.

44. Based on the foregoing, I recommend that:

    A. Plaintiff's Motion to Reverse be denied as it pertains to his claim for benefits under Title II (DIB) and that the Commissioner's decision denying benefits under Title II be affirmed.

    B. The ALJ's determination that there was no medical evidence of a pain producing impairment prior to November 1995 be affirmed.

C. That Plaintiff's Motion to Reverse be granted in part as it pertains to his claim for benefits under Title XVI (SSI), and that this case be remanded to the Commissioner for additional proceedings to include:

1. A function by function analysis of Plaintiff's physical residual functional capacity.

2. Additional proceedings at step five of the sequential evaluation process.

**RICHARD L. PUGLISI**
**UNITED STATES MAGISTRATE JUDGE**